IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CT-3127-FL

| | | |
|---|---|---|
| NATHANIEL R. WEBB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DIRECTOR BUTLER, YOLANDA | ) | |
| BANKS, E. GEORGE, V. FREDERICK, | ) | |
| KENNETH BLACKWELL, and MARK | ) | |
| SZAJNBERG, | ) | |
| | ) | |
| Defendants.[1] | ) | |

This matter is before the court on the parties' cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 (DE 101, 107, 138). The motions were briefed fully and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff, a former state pretrial detainee proceeding pro se, commenced this action by filing complaint on May 31, 2018, asserting claims for violations of his civil rights pursuant to 42 U.S.C. §§ 1983 and 1985. Following a period of frivolity review and resolution of motion to dismiss, plaintiff was allowed to file the operative amended complaint on July 31, 2018, asserting claims under the First, Sixth, and Fourteenth Amendments to the United States Constitution. In particular, plaintiff alleges defendants seized his legal and non-legal mail and provided it to the

---

[1]      The court dismissed formerly named defendant Wake County Jail by separate order entered December 21, 2018.

prosecutor and investigators in his criminal case ("prosecution team"), that defendants prohibited him from communicating with his wife while he was a pretrial detainee, and that defendants retaliated against him for filing grievances.   Defendants, sued in both their individual and official capacities, are Director Butler ("Butler"), former director of detention services for the Wake County Sheriff's Office ("WCSO"); Yolanda Banks ("Banks"), administrative supervisor for the Wake County Detention Center ("WCDC") mail room; E. George ("George"), administrative assistant for the WCDC mail room; V. Frederick ("Frederick"), administrative assistant for the WCDC mail room; Kenneth Blackwell ("Blackwell"), former investigator with the WCSO; and Mark Szajnberg ("Szajnberg"), sergeant with the WCSO.   As relief, plaintiff seeks nominal, compensatory, and punitive damages, and various forms of injunctive relief.

Following a period of discovery, and in accordance with the court's case management order, plaintiff moved for partial summary judgment as to his retaliation claim, relying upon a memorandum of law, statement of undisputed facts, his personal declaration, and appendix of exhibits comprising the following:

1) plaintiff's WCDC grievance records and inmate requests;

2) affidavit of WCDC correctional officer Lieutenant McDougald;

3) correspondence between plaintiff and Wake County Sheriff Donnie Harrison ("Sheriff Harrison"); and

4) correspondence between Virginia Tharrington ("Tharrington"), legal counsel to the WCSO, and plaintiff.

Defendants responded to plaintiff's motion by filing a cross motion for partial summary judgment as to the retaliation claim, relying upon a memorandum of law, statement of material

2

facts, and appendix of exhibits thereto, comprising the following:

1) affidavit of defendant Butler with exhibits 1-13 comprising WCSO detention policies, plaintiff's grievances and inmate requests, inmate logs, judicial records from plaintiff's criminal proceedings, Prison Rape Elimination Act investigative materials, and other miscellaneous records regarding plaintiff's pretrial detention;

2) plaintiff's grievance records;

3) affidavit of Jared S. Ollison, WCSO director of detention services with exhibits 1-5 comprising WCSO detention resident handbook, and the same exhibits filed in support of defendant Butler's affidavit;

4) excerpts of transcripts of plaintiff's deposition;

5) warrant for plaintiff's arrest;

6) excerpts of plaintiff's inmate log; and

7) plaintiff's transcript of plea.

Plaintiff responded in opposition to defendants' cross motion for partial summary judgment relying upon a memorandum of law, opposing statement of material facts, and appendix of exhibits thereto comprising the following:

1) affidavit of plaintiff;

2) defendant Butler's responses to plaintiff's first request for admissions;

3) excerpts of the WCSO detention resident handbook;

4) plaintiff's medical and mental health records; and

5) plaintiff's grievance records.

Defendants replied in support of their motion for partial summary judgment, relying upon excerpts

3

of defendants' responses to plaintiff's discovery requests.

Defendants next moved for summary judgment as to plaintiff's remaining claims on June 3, 2021. In support of their second motion, defendants rely upon memorandum of law, statement of material facts, and appendix of exhibits thereto, comprising the following:

1) affidavit of defendant Szajnberg with exhibits 1-5 comprising plaintiff's warrant for arrest, emails between Szajnberg and WCDC staff, and judicial records from plaintiff's criminal case;

2) affidavit of Wake County assistant district attorney Melanie A. Shekita ("Shekita");

3) affidavit of defendant Butler and exhibits 1 through 6 comprising WCSO detention center operations manual, WCSO detention resident handbook, excerpts of plaintiff's inmate logs, defendant Szajnberg's request for plaintiff's mail, and Wake County Superior court order directing no contact between plaintiff and his wife;

4) affidavit of defendant Blackwell with exhibit comprising email communications regarding defendant Szajnberg's request for plaintiff's mail;

5) affidavit of defendant Banks;

6) affidavit of defendant George;

7) affidavit of defendant Frederick;

8) notice of intent to introduce 404(b) evidence filed in plaintiff's criminal case;

9) subpoena duces tecum to Shekita;

10) subpoena duces tecum to Curtis High ("High"), plaintiff's former criminal defense attorney;

11) Wake County Jail legal mail log;

4

12) legal mail incident report; and

13) excerpts of transcripts of plaintiff's deposition.

Plaintiff responded in opposition to defendants' second motion for summary judgment on June 29, 2021, relying upon a memorandum of law, opposing statement of material facts, and appendix of exhibits thereto comprising the following:

1) affidavit of third-party witness Michael Quadrel ("Quadrel");

2) affidavit of third-party witness Freya Turppa ("Turppa");

3) affidavit of MaryAnn Coleman ("Coleman"), the grandmother of plaintiff's wife;

4) copies of envelopes of plaintiff's outgoing mail;

5) correspondence between plaintiff and the OI Foundation;

6) correspondence between plaintiff and Shekita regarding her responses to plaintiff's subpoena;

7) correspondence between plaintiff and Coleman, Cheryl Rader ("Rader"), a case worker with North Carolina Child Protective Services, and Roy Webb ("Webb"), plaintiff's grandfather;

8) correspondence between plaintiff and the North Carolina Supreme Court;

9) plaintiff's grievance records;

10) communications between plaintiff and WCDC staff regarding plaintiff's request to communicate with his wife;

11) emails between Gale Bailey-Lee ("Bailey-Lee"), a WCSO detention captain, and Tharrington regarding plaintiff's requests to communicate with his wife;

12) correspondence between plaintiff and the clerk of this court;

5

13) credit alert inquiry as to plaintiff;

14) email between plaintiff and High;

15) defendants' responses to plaintiff's interrogatories and requests for admission;

16) affidavit of plaintiff; and

17) plaintiff's WCDC inmate requests.

Defendants replied in support of their second motion for summary judgment, relying upon an affidavit of Bailey-Lee and exhibits thereto comprising emails between plaintiff and various third-parties, excerpts of transcript of plaintiff's deposition, and Wake County Superior Court orders assigning counsel to plaintiff in his underlying criminal case. With leave of court, plaintiff filed a sur-reply in opposition[2] to defendants' second motion for summary judgment.

## STATEMENT OF THE FACTS

Except as otherwise noted below, the court recounts the facts in the light most favorable to plaintiff.

A.    Plaintiff's Arrest and Prosecution

In July 2016, defendant Szajnberg, then a senior investigator with the WCSO criminal investigation division, responded to a request for assistance from the Wake Medical Center regarding plaintiff's infant daughter. (Szajnberg Aff. (DE 141-1) ¶¶ 4, 6; Defs' Stmt. (DE 140) ¶¶ 2–3). Medical providers had identified several suspicious fractures on the child's body while taking x-rays for an unrelated medical issue. (Defs' Stmt. (DE 140) ¶ 2; Szajnberg Aff. (DE 141-1) ¶ 6). Defendant Szajnberg and child protective services suspected child abuse was the cause

---

[2]    This clerk's office originally designated this filing as a motion to strike and objection to defendants' reply. By order entered September 14, 2021, the court found that the filing should be construed in part as a sur-reply and granted leave to file same.

6

of the fractures and commenced an investigation.  (Szajnberg Aff. (DE 141-1) ¶¶ 7–12).   On July 22, 2016, defendant Szajnberg obtained a warrant for plaintiff's arrest based on finding of probable cause that plaintiff committed intentional child abuse.   (Id. ¶ 13 & Ex. A).   When WCSO officers attempted to serve the warrant, however, they discovered plaintiff had fled the state with his then wife, Diandra Webb.   (Id. ¶¶ 13–16).

Shekita, the prosecutor overseeing the investigation, approved full extradition warrants for both plaintiff and his wife.  (Shekita Aff. (DE 141-2) ¶¶ 11–12).   On October 12, 2016, authorities with the United States Marshals Service apprehended plaintiff and his wife in Edmonds, Washington.   (Szajnberg Aff (DE 141-1) ¶ 20).   During a search of their residence, the officers recovered a journal in which plaintiff and his wife discussed recordings and other research they intended to present at a forthcoming trial for the child abuse charges.   (Id. ¶¶ 22).

On October 25, 2016, plaintiff and his wife were indicted for felony child abuse inflicting serious injury.  (Defs' Stmt. (DE 140) ¶ 17).   Following extradition to North Carolina in late October 2016, plaintiff was housed at the WCDC while Diandra was housed at the PSC.   (Id. ¶ 18).   Plaintiff remained incarcerated at either the WCDC or the PSC until he pleaded guilty to the foregoing charge.   (Pl's Aff. (DE 122-1) ¶¶ 1-15; Szajnberg Aff. (DE 141-1) ¶ 39).   On December 14, 2018, WCSO officials transferred custody of plaintiff to the North Carolina Department of Public Safety.   (Butler Aff. Ex. 3 (DE 141-3) 18; Pl's Aff. (DE 122-1) ¶¶ 1-15).

B.    Jail Mail Watch List

The Jail Mail Watch List is a program administered by Wake County detention officers in consultation with the prosecuting attorney and the relevant lead investigators.   (Shekita Aff. (DE 141-2) ¶¶ 35–37; Butler Aff. (DE 141-3) ¶¶ 26–27).   Typically, the prosecuting attorney or

investigator requests that WCSO staff place the detainee on the Jail Mail Watch List. (Shekita Aff. (DE 141-2) ¶¶ 35–37; Butler Aff. (DE 141-3) ¶¶ 28–34). The policy requires that the detainee's outgoing and incoming non-legal mail be opened, photocopied, and provided to the prosecutorial team. (Shekita Aff. (DE 141-2) ¶¶ 35–37; Butler Aff. (DE 141-3) ¶¶ 28–34). According to defendants, detainee mail that qualifies as "legal mail" under relevant WCSO detention division policy is not collected under the Jail Mail Watch List program. (Defs' Stmt. (DE 140) ¶ 24; Butler Aff. (DE 141-3) ¶ 34).

On November 2, 2016, defendant Szajnberg initiated request that WCDC detention staff place plaintiff and his wife on the Jail Mail Watch List, thereby permitting collection of all their non-legal mail. (Defs' Stmt. (DE 140) ¶ 25; Szajnberg Aff. (DE 141-1) ¶¶ 25–31). According to Shekita, she requested that defendant Szajnberg collect plaintiff's mail due to concerns that plaintiff would attempt to communicate with his wife and others to fabricate testimony in his anticipated trial, improperly influence the investigation, or hide inculpatory evidence. (Shekita Aff. (DE 141-2) ¶¶ 18–26). Shekita was specifically concerned because plaintiff and his family had attempted to gain access to his daughter when she was in the hospital and a no-contact order was in place, which reinforced her belief that plaintiff would attempt to exert influence over the child's guardian (his paternal grandmother) while he was detained. (Id. ¶¶ 30–31). Shekita also had concerns that plaintiff would attempt to fabricate evidence based on the journal entries found during the search of plaintiff and his wife's residence, which discussed the evidence that they could use at trial. (Id. ¶¶ 26).[3]

At the time defendant Szajnberg requested plaintiff's mail, detention officers did not notify

---

[3]    Plaintiff states that Shekita holds a "grudge" against plaintiff because he was found not guilty in a prior criminal trial that Shekita prosecuted and suggests that is the real reason that she placed plaintiff on the Jail Mail

him he had been placed on the list.  (Pl.'s Opp. Stmt. (DE 144) ¶ 25).  Defendants Blackwell, Banks, George, and Frederick, WCSO detention officers, were primarily responsible for copying plaintiff's outgoing and incoming legal mail and providing it to defendant Szajnberg or Shekita. (Blackwell Aff. (DE 141-4) ¶¶ 11–19; Banks Aff. (DE 141-5) ¶¶ 23–26; George Aff. (DE 141-6) ¶¶ 14–18; Frederick Aff. (DE 141-7) ¶¶ 11–13).

Plaintiff complains that hundreds of pieces of his mail were opened, photocopied, and delivered to his prosecution team during his time at WCDC and PSC.  (Compl. (DE 1-1) at 2–3).[4] Plaintiff first learned that he was on the Jail Mail Watch List in March 2017, when his then criminal defense attorney informed him that his mail was being opened, copied, and provided to counsel. (Id. at 2).  On June 12, 2017, plaintiff's attorney had in his possession 200 to 300 pieces of plaintiff's photocopied correspondence, which also had been provided to Shekita.  (Id.).  On August 24, 2017, plaintiff determined that another 100 to 200 pieces of his mail had been provided to Shekita and his attorney.  (Id. at 3).  Some of this mail "contained . . . case research, defense materials, trial strategy, and other private subjects."  (Id. at 3).

In addition, after learning that his mail was being photocopied and provided to the prosecution team, plaintiff began marking his mail "legal mail" or "confidential legal materials enclosed."  (Pl's Resp. (DE 145) at 17).[5]  Although identified as legal mail, plaintiff did not send

---

Watch List.  (Pl's Resp. (DE 145) at 3).

[4]      Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.   Additionally, plaintiff's verified complaint is the equivalent of an opposing affidavit for purposes of deciding the instant motions for summary judgment.   See Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021).

[5]      Plaintiff response brief is also a sworn declaration.   (DE 145 at 22).

the correspondence to his attorney or the courts, instead mailing it to family members or other third parties.  (See, e.g., Coleman Aff. (DE 146-3) at 1; see also Envelopes (DE 146-4)).

C.    Spousal Communications

As noted above, plaintiff and his wife were both housed at Wake County detention facilities following their arrests in October 2016.  (Defs' Stmt. (DE 140) ¶ 17; Butler Aff. (DE 141-3) ¶¶ 35–36).   Shortly after plaintiff's arrival at WCDC, he was informed that communication with his wife was prohibited where she was also in a Wake County detention facility.  (Butler Aff. (DE 141-3) ¶ 37; Compl. (DE 1-1) at 8).[6]   According to defendant Butler, WCSO detention officers prohibited contact between plaintiff and his wife because co-defendants "may communicate escape plans, coordinate attacks, facilitate gang activity, or orchestrate other conduct that poses a threat to the facility or endangers the safety of detention staff and other inmates."  (Id. ¶¶ 46–47).   In addition, officers wanted to ensure that co-defendants did not engage in illegal activity related to their case, such as obstruction of justice, which was a particular concern for plaintiff and his wife who were still under investigation at their time of their arrests.  (Id. ¶ 48).   Finally, the policy also promotes the security of the institution by establishing a general rule applicable to all co-defendants and ensuring other detainees do not perceive that co-defendants are communicating to facilitate illegal activity.  (Id. ¶ 49–50).

Despite the policy prohibiting communications between plaintiff and his wife, they continued to attempt to communicate through third parties.  (See Pl.'s Exs. 7, 9–11, 13–16 (DE 146)).   Shekita accordingly sought a court order directing that plaintiff have no direct or indirect

---

[6]    Plaintiff states that he was not provided an explanation for this policy, (see Compl. (DE 1-1) at 8), but grievances in the record belie this assertion.  (See Pl.'s Ex. 29 (DE 146-29) (denying plaintiff's request for communication with his wife because "inmate to inmate mail is not permitted")).

contact with his wife. (Shekita Aff. (DE 141-2) ¶ 39). On May 16, 2017, the Wake County Superior Court entered a bail modification order that prohibited plaintiff from having any direct or indirect contact with his wife or any other co-defendant ("no contact order"). (Butler Aff. Ex. 6 (DE 143-3) at 49).

Plaintiff and his wife "have always maintained a close and personal relationship," and they need to communicate to discuss family and financial responsibilities, as well as maintain their relationship. (Compl. (DE 1-1) at 8). Plaintiff submitted multiple requests and grievances requesting that detention officers allow communication with his wife. (See DE 146-25, -26, -27, -28, -29, -43, -44). These requests were denied pursuant to the detention center policy banning communication between co-defendants and (subsequently) the state court's no contact order. (Butler Aff. (DE 143-3) ¶¶ 37, 45–46; Butler Aff. Ex 12 (DE 110-1) at 70). Plaintiff therefore was not allowed to communicate with his wife during his two-year period of pretrial detention. (See Butler Aff. (DE 143-3) ¶¶ 37, 45–46). The communication ban ended in December 2018 after plaintiff's wife pleaded guilty to misdemeanor obstruction of justice and was released. (Pl.'s Aff. (DE 146–40) ¶ 34). Although plaintiff and his wife remain married, the two-year ban on communications "has severely affected [their] relationship." (Id. ¶ 37).

D.    Retaliation

As noted above, plaintiff also alleges defendant Butler retaliated against him for filing grievances by transferring him to the PSC. Plaintiff was first housed at the WCDC after he was extradited to North Carolina on October 31, 2016. (Pl.'s Aff. (DE 122-1) ¶¶ 1–2). During plaintiff's time at the WCDC, he submitted numerous grievances challenging various aspects of WCSO detention policy. (Id. ¶¶ 43, 46; see also Grievance Records (DE 110-2)). WCSO

11

detention policy allows detainees to appeal grievance responses to defendant Butler.  (WCSO Resident Handbook (DE 122-5)).  Plaintiff persistently requested that defendant Butler respond to his grievances but he was not generally successful at obtaining direct responses from Butler.[7]  (See Pl's Aff. (DE 122-1) ¶¶ 43–44; Grievance Records (DE 110-2) at 12, 13, 18, 20).

Having received no responses from defendant Butler directly, plaintiff wrote to Sheriff Harrison about his various complaints on January 16, 2018.  (Pl's Stmt. (DE 101-1) ¶ 4; see also Sheriff Harrison Corr. (DE 101-2) at 11-13)).  The correspondence to Sheriff Harrison was referred to Tharrington, the WCSO legal advisor, who responded on February 9, 2018, noting therein that Sheriff Harrison had discussed plaintiff's grievances with "detention management staff."  (Tharrington Corr. (DE 110-1) at 69–71).  In the meantime, plaintiff filed one of his many grievances about the ban on communicating with his wife on January 29, 2018.  (Butler Aff. Ex. 11 (DE 110-1) at 67).  On February 5, 2018, defendant Butler drafted a response to plaintiff's appeal of the grievance.  (Butler Aff. (DE 110-1) ¶¶ 30–32).  Defendant Butler explained that plaintiff was not allowed to communicate with his wife due to entry of the no contact order in plaintiff's criminal case.  (Id. ¶ 32; Grievance Resp. (DE 110-1) at 65).

Plaintiff was transferred to the PSC on February 8, 2018, allegedly in retaliation for pursuing the foregoing grievances.  (See Pl's Aff. (DE 122-1) ¶ 10).  According to plaintiff, the PSC is older than the WCDC, and it is referred to as "the dungeon" by other detainees.  (Id. ¶ 16).  The PSC houses general population inmates (plaintiff's classification at the time), disciplinary segregation units, juvenile housing units, and federal detainees.  (Id.).  The environment is so

---

[7]     According to defendant Butler, he designated an authorized representative to respond to grievance appeals. (Defs' Stmt. (DE 109) ¶ 3).

undesirable among the detainees that WCDC detention officers threaten detainees with "going downtown to the PSC" to motivate compliance with institutional rules. (Id.).

The PSC and WCDC differ in numerous ways. Due to the segregation and juvenile housing units, the PSC has more unscheduled facility-wide "lockdowns" (which require plaintiff to remain in his cell) than the WCDC. (Id. ¶ 17). Friday evening lockdowns also occur earlier in the evening at the PSC, at approximately 5:30 p.m., to accommodate processing of inmates into the weekend service program at the PSC. (Id.; see also Defs' Stmt. (DE 109) ¶ 28). The recreation areas do not have natural light and air (unlike the WCDC) and recreation areas generally can be accessed more readily at the WCDC than the PSC. (Pl's Aff. (DE 122-1) ¶ 17). The PSC does not have electronic kiosks permitting easy access to the grievance procedure and emails. (Id. ¶ 19). The WCDC has more television sets and phones than the PSC, and the phones are more difficult to access at the PSC due to the greater amount of lockdown time. (Id. at 21–22). Finally, the PSC is a more "hostile" environment with less supervision of detainees. (Id. at 23).

Several weeks after plaintiff's transfer to the PSC, mental health staff placed him on psychological observation due to suicidal ideations, and a psychiatrist prescribed mental health medications. (Pl's App. Exs 7-14 (DE 122)). A psychiatrist determined that plaintiff was "adversely affected by [the PSC's] darkened environment" and recommended transfer to the WCDC. (Pl's App. Ex. 13 (DE 122-13)). Plaintiff, however, remained housed on the PSC until September 2018, except for brief transfers to the WCDC for psychological observations. (Pl.'s Aff. (DE 122-1) ¶¶ 10–15).

According to defendant Butler, plaintiff was transferred to the PSC because plaintiff's wife had been transferred to the WCDC and due to plaintiff's conflicts with a detention officer at the

13

WCDC. (Butler Aff. (DE 110-1) ¶¶ 48, 51–56). In particular, on January 30, 2018, all female detainees, including plaintiff's wife, were rehoused from the PSC to the WCDC. (Id. ¶ 52). With respect to plaintiff's conflict with the detention officer, plaintiff submitted multiple grievances against the officer that were found to be unsubstantiated between December 30, 2017, and February 8, 2018. (Id. ¶¶ 40–49). Detention officers determined that plaintiff should be rehoused to the PSC to avoid further conflict with the officer. (Id. ¶ 48). Plaintiff notes, however, that he was rehoused to the WCDC on multiple occasions for psychological observation, and that he was permanently transferred back to the WCDC on September 19, 2018, even though plaintiff's wife and the detention officer were both assigned to the WCDC during these periods of time. (Pl's Aff. (DE 122-1) ¶¶ 10–15).

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case

14

properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

15

Defendants raise the defense of qualified immunity as to plaintiff's claims. [8] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Accordingly, "[t]o overcome an official's claim of qualified immunity, the plaintiff must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Attkisson v. Holder, 925 F.3d 606, 623 (4th Cir. 2019) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).

In determining whether the right at issue was clearly established, the court must define "the right allegedly violated . . . at the appropriate level of specificity." Wilson v. Layne, 526 U.S. 603, 615 (1999). This does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362–63 (internal quotation marks omitted). The right allegedly abridged is "clearly established" for qualified immunity purposes in the following circumstances:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law

---

[8] Plaintiff correctly points out that qualified immunity does not apply to his requests for injunctive relief. See Pearson v. Callahan, 555 U.S. 223, 242–43 (2009). His claims for injunctive relief, however, are moot where plaintiff has been transferred to custody of the North Carolina Department of Public Safety. See Rendelman v. Rouse, 569 F.3d 182, 186–87 (4th Cir. 2009) (Butler Aff. Ex. 3 (DE 141-3) at 18 (documenting plaintiff's transfer)). Accordingly, where plaintiff's relief is limited to damages, qualified immunity is a dispositive issue in this case.

16

the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted).   In conducting the clearly established analysis, the court looks to "cases of controlling authority in this jurisdiction—that is, decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose."   Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th 2017) (internal quotations and citations omitted).   In the absence of authority from the foregoing sources, the court "may look to a consensus of cases of persuasive authority from other jurisdictions."   Id. at 538–39 (internal quotations omitted).

1.      Jail Mail Watch List

Plaintiff asserts that wholesale copying of his general (non-legal) mail and provision of it to third parties violates his First Amendment right to send and receive mail.   See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Matherly v. Andrews, 859 F.3d 264, 280–81 (4th Cir. 2017). As the parties agree, the question of whether this policy violates plaintiff's First Amendment rights is governed by the four-part test set forth in Turner v. Safley, 482 U.S. 78, 96–99 (1987).   See Matherly, 859 F.3d at 281 (applying Turner test to similar claim challenging interference with mail); Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993) (applying Turner to First Amendment challenge brought by pretrial detainee).

Where a jail policy or regulation impinges on protected First Amendment activity,[9] the regulation may be upheld if it is "reasonably related to legitimate penological interests."   Turner, 482 U.S. at 89.   In assessing reasonableness, the court considers the following four factors:

(1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether

---

[9]      Defendants do not argue that wholesale opening and copying plaintiff's mail and turning it over to the prosecution team does not impinge on plaintiff's First Amendment rights.

"alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an "absence of ready alternatives" to the regulation in question.

Heyer v. United States Bureau of Prisons, 984 F.3d 347, 356 (4th Cir. 2021) ("Heyer II") (quoting Turner, 482 U.S. at 89–90)). Plaintiff bears the burden of establishing the regulation is unreasonable, and the court owes "substantial deference" to the judgments of jail officials. Id. Nevertheless, "this deference is not limitless" and the court "will not sustain policies that lack a reasonable connection between ends and means." Id. (quoting Haze v. Harrison, 961 F.3d 654, 658 (4th Cir. 2020)).

Here, defendants placed plaintiff on the Jail Mail Watch List out of concerns that he may attempt to communicate with his wife and others to fabricate testimony, otherwise improperly influence the investigation, or hide inculpatory evidence. (Shekita Aff. (DE 141-2) ¶¶ 18–26).[10] These concerns were particularly acute where plaintiff (prior to his arrest) and his family had attempted to gain access to his daughter when a no-contact order was in place. (Id. ¶¶ 30–31). Shekita also had concerns that plaintiff would attempt to fabricate evidence based on the discovery of journal entries where they discussed the evidence that they could use at trial. (Id. ¶¶ 26).

The foregoing justifications qualify as legitimate governmental interests. See Matherly, 859 F.3d at 282 (concluding defendants satisfied Turner factor one where "BOP administrators responded to randomly intercepted mail that threatened the safety of individuals outside of FCI Butner and stymied the rehabilitation of the civil detainees by exercising their professional

---

[10] Although plaintiff suggests he was placed on the mail watch list due to a "grudge" Shekita held against him from a 2010 case, (see Pl's Resp. (DE 145) at 3), there is no specific evidence in the record supporting the assertion that plaintiff was placed on the mail watch list for this reason.

judgment to review all incoming and outgoing mail"); Heyer v. United States Bureau of Prisons, 849 F.3d 202, 215 (4th Cir. 2017) ("Heyer I") ("There is no doubt that BOP has a legitimate interest in maintaining the security of its facilities and in protecting the public from further criminal acts by inmates and detainees."). Plaintiff's attempts to contact his daughter after suspected child abuse was discovered and child protective services implemented a no contact order raises significant concerns that plaintiff may attempt further contact and even recruit others to harm the child. (See Shekita Aff. (DE 141-2) ¶¶ 31–33). And WCDC has a legitimate penological interest in preventing plaintiff from obstructing an ongoing investigation into serious criminal offenses. See Heyer I, 849 F.3d at 215.

The court next turns to whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89. "A logical connection, even in the most general sense, will suffice." Heyer II, 984 F.3d at 357 (internal quotation omitted). Here, having trained prosecutors or criminal investigators review plaintiff's outgoing and incoming mail for evidence of suspected obstruction of justice or other criminal conduct is rationally related to the legitimate governmental interests set forth above. See Matherly, 859 F.3d at 282; see also United States v. Cook, 457 F. App'x 285, 286 (4th Cir. 2017) (upholding policy permitting inspection of inmate's mail to prevent further criminal conduct); see also Grassler v. Wood, 14 F.3d 406, 409 (8th Cir. 1994) (upholding policy permitting law enforcement officials to read inmate mail); United States v. Walker, No. 2:18-CR-37-FL-1, 2019 WL 4412909, at *9 (E.D.N.C. Sept. 13, 2019) (finding that policy allowing FBI agent to monitor pretrial detainee's telephone calls and later prohibiting all communication except with his attorney was rationally connected to legitimate governmental interests given concerns about

19

further criminal conduct).

Plaintiff argues that defendants' proffered justifications are pretext, and that Shekita placed him on the Jail Mail Watch List "in order to gain tactical advantages over plaintiff by means of acquiring information and chilling plaintiff's ability to seek defense materials." (Pl.'s Resp. (DE 145) at 3). He further argues that defendants collected his mail for "investigatory purposes" only, which are unrelated to legitimate penological interests in security or orderly running of a pretrial detention facility. (Id. at 5). As set above, the record belies these conclusory assertions. Shekita and defendants were responding to legitimate security concerns raised by plaintiff's pre-arrest conduct. (See Shekita Aff. (DE 141-2) ¶¶ 22–33).[11] Moreover, the court is required to defer to government officials' proffered justifications. See Heyer II, 984 F.3d at 356.

Plaintiff fails to address the remaining Turner factors. See Heyer II, 984 F.3d at 357 (explaining plaintiff bears the burden of establishing the policy is unreasonable under Turner). Turner factor two questions whether the plaintiff has alternative means of exercising his right to send and receive mail. 482 U.S. at 90. Plaintiff's mail was not delayed or otherwise censored during him time at the WCDC or PSC. (Butler Aff. (DE 141-3) ¶ 43). And plaintiff retained the right to communicate with his family and others through in-person visits, telephone calls, and electronic mail. (Id. ¶ 38). This factor weighs in favor of defendants. As to factor three, defendants have submitted uncontradicted evidence that requiring require detention officers (as

---

[11]     For this reason, plaintiff's reliance on United States v. Cohen, 796 F.2d 20 (1986) is misplaced. In that case, the undisputed justification for the search of the plaintiff's cell was to gather information to use against plaintiff in a forthcoming trial. Cohen, 796 F.2d at 24. In addition, Cohen predated Turner, and it effectively limited the government to proffering facility security interests when attempting to justify a cell search. Id. at 23–24. As set forth above, that is not the law of this circuit. See, e.g., Heyer II, 984 F.3d at 357. The remaining cases plaintiff offers in support of his position are inapposite. See Haze, 961 F.3d at 657 (addressing legal mail); Jolivet v. Deland, 966 F.2d 573 (10th Cir. 1992) (addressing damages calculation).

20

opposed to trained investigators) to read and interpret all his mail would impose significant administrative burdens. (See id. ¶¶ 4–13, 52–54; Banks Aff. (DE 141-5) ¶ 19). And plaintiff offers no ready alternatives to defendants' policy, as required under Turner factor four.

Accordingly, plaintiff has failed to establish that defendants' Jail Mail Watch List policy is unreasonable under Turner. On this record, the court finds that the policy is reasonably related to legitimate penological interests. See Turner, 482 U.S. at 89.

Furthermore, even assuming plaintiff established a constitutional violation, defendants would be entitled to qualified immunity. Plaintiff points to no controlling authority or consensus of persuasive authority, and the court is aware of none, suggesting the "contours of" his alleged First Amendment right to have only jail personnel inspect his mail were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; see also Grassler, 14 F.3d at 409 (upholding similar policy).

Plaintiff also alleges that his legal mail was opened, copied, and provided to the prosecution team. The court agrees with defendants that there is insufficient record evidence supporting this assertion with respect to plaintiff's mail that complies with the WCDC legal mail policy. With respect to mail that plaintiff marked "legal mail" based on his pro se status, but that did not otherwise comply with the WCDC legal mail policy, defendants are entitled to qualified immunity. Plaintiff also fails to offer sufficient record evidence establishing that his legitimate pro se filings were subject to copying.

WCSO policy requires that legal mail be properly marked and sent to either attorneys, federal or state courts, federal and state attorney general offices, the judiciary, the North Carolina Industrial Commission, legal aid providers, paralegals, district attorney offices, county attorney

21

offices, probation or parole officers, or clerks of courts. (Butler Aff. Ex. 1 (DE 141-3) at 10).

Plaintiff argues that legal mail he sent to the North Carolina Supreme Court was tampered with,

that a non-party allegedly read his legal mail during a cell search, and that defendant Frederick

admitted to one incident of accidentally opening plaintiff's legal mail. (See Pl's Resp. (DE 145)

at 11–13). Other than plaintiff's unsupported speculation, there is no evidence that the legal mail

sent to the North Carolina Supreme Court was opened, read, and copied by defendants. The

response to plaintiff's grievance indicates that the mail was likely lost by the postal service. (See

Pl.'s Ex. 19 (DE 146-19)). And fact that a non-party read plaintiff's legal mail during a cell search

is not probative of whether defendants personally copied or otherwise interfered with his legal

mail, particularly where this mail was not alleged to have been collected pursuant to the Jail Mail

Watch List. (See Pl's Ex. 23 (DE 146-23)). Finally, defendant Frederick's opening of plaintiff's

legal mail on one occasion does not rise to the level of a constitutional violation. See Buie v.

Jones, 717 F.2d 925, 926 (4th Cir. 1983) (concluding a few isolated instances of improper handling

of an inmate's mail did not establish a constitutional violation). Accordingly, with the respect to

any legal mail that complied with the WCSO policy, plaintiff offers insufficient evidence to

establish defendants read, copied, and provided such mail to the prosecution team.[12]

Plaintiff also argues that all mail he deems confidential legal mail – regardless of the

addressee – is entitled to protection under the WCSO policy where he is a pro se litigant. (Pl.'s

Mem. (DE 145) at 14–17). This novel theory would allow plaintiff to wholly avoid the WCSO's

---

[12]     Plaintiff also provides an email he sent to his criminal defense attorney that was allegedly read by detention officers. (See Pl.'s Ex. 32 (DE 146-32)). This email does not qualify as legal mail under the WCSO detention policy because it is not standard postal mail. (See Butler Aff. Ex. 1 (DE 141-3) at 10). Furthermore, the email system directly warns detainees that all emails are monitored. (Bailey-Lee Aff. (DE 147-1) ¶ 5).

mail restrictions by simply labeling all his mail "legal mail."   *See* Matherly, 859 F.3d at 282–83 (holding correctional officials may monitor outgoing non-legal mail to promote institutional security and other governmental interests).   In any event, and as defendants explain, plaintiff was represented by counsel for all but two weeks of his time at the WCDC/PSC, and the only mail he offers as protected under this theory relates to his defense strategy in his criminal case.   (See Defs' Reply (DE 147) at 4–6; Pl.'s Dep. (DE 147-2) at 1–14; Assignments of Counsel (DE 147-3); Pl's Exs. 3-5, 7-18).   Plaintiff is not entitled to hybrid pro se and counseled representation.   *See* McKaskle v. Wiggins, 465 U.S. 168, 183 (1984).   His requests for investigative materials and discussions about his legal strategy therefore should have been confined to communications with his attorney (or the attorney's agents) if maintaining confidentiality was paramount. Accordingly, plaintiff fails to offer sufficient evidence supporting his claim that his pro se filings or other work product related to cases outside his underlying criminal proceedings were copied and distributed to the prosecution team.

Even assuming, however, that a sufficient evidentiary basis existed to support this claim, and the WCSO's legal policy could not be justified under Turner when a detainee proceeds pro se, defendants would be entitled to qualified immunity.   Plaintiff points to no legal authority, binding or persuasive, that would come close to establishing the contours of his alleged right to deem any mail he personally selects as confidential legal mail when he proceeds pro se.[13]

---

[13]      The right to have legal mail opened in an inmate's presence and not otherwise read by prison officials likely was clearly established at the time of plaintiff's placement on the Jail Mail Watch List.   *See* Haze v. Harrison, 961 F.3d 654, 660 n.4 (4th Cir. 2020).   But the cases establishing that right addressed legal mail that otherwise complies with the institution's legal mail policy.   *See* Merriweather v. Zamora, 569 F.3d 307, 310, 317 (6th Cir. 2009); Al-Amin v. Smith, 511 F.3d 1317, 1320, 1330–31 (11th Cir. 2008); Jones v. Brown, 461 F.3d 353, 355–59 (3d Cir. 2006); Davis v. Goord, 320 F.3d 346, 350–51 (2d Cir. 2003); Jensen v. Klecker, 648 F.2d 1179, 1181–82 (8th Cir. 1981); Ramos v. Lamm, 639 F.2d 559, 581–82 (10th Cir. 1980); see also Hayes v. Idaho Corr. Cntr., 849 F.3d 1204, 1206–07, 1211 (9th Cir. 2017) (holding district court properly dismissed claim alleging defendant opened legal mail where the mail in question did not qualify as legal mail under relevant correctional policy).   The court is aware of no

In sum, with respect to the legal mail claims, there is insufficient evidence that defendants read, copied, or otherwise provided legitimate legal mail to the prosecution team. And defendants are entitled to qualified immunity with respect to plaintiff's claim that his pro se legal mail addressed to family members or other organizations qualifies as legal mail. Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's First and Sixth Amendment[14] claims challenging interference with his legal mail.

2.      Spousal Communications

For many of the same reasons set forth above, the ban on spousal communication between plaintiff and his wife is justified under Turner. Plaintiff was banned from spousal communications where he and his wife were incarcerated together and potential co-defendants in the underlying criminal proceeding. (See Butler Aff. (DE 141-3) ¶¶ 37, 46–47). As noted above, defendants have established a legitimate governmental interest in protecting the public from further crimes by plaintiff and preventing attempts to obstruct an ongoing criminal proceeding. See Matherly, 859 F.3d at 282; Heyer I, 849 F.3d at 215. And the communication ban is rationally connected to these governmental interests where plaintiff and his wife were potential co-defendants,[15] the journal entries found during the search of their residence suggested possible attempts to obstruct the investigation, and the remained under active investigation after their

---

authority extending protections to mail the inmate himself deems legal in nature regardless of the addressee. Nor is this right "manifestly included within more general applications of the core constitutional principle[]" protecting the confidentiality of legal mail. See Booker, 855 F.3d 538.

[14]    Where plaintiff fails offer evidence establishing interference with properly marked legal mail, he cannot establish a Sixth Amendment violation based on interference with his right to counsel. See Guajardo-Palma v. Martinson, 622 F.3d 801, 803-05 (7th Cir. 2010).

[15]    Plaintiff notes that Shekita was unsuccessful in her attempts to join him and his wife as co-defendants. (Pl's Opp. Stmt. (DE 144) ¶ 21).

arrests.  (See Shekita Aff. (DE 141-2) ¶¶ 17–33).   The ban on co-defendant communications also addresses security risks, including potential communication of escape plans and coordination of gang activity, assaults, or other criminal activity.  (Butler Aff. (DE 141-3) ¶ 47).   Finally, the policy promotes institutional security by ensuring other detainees know that co-defendant communications are not allowed.  (Id. ¶ 50).  Plaintiff offers no evidence that the policy is not rationally connected to these interests.

Turning to the remaining Turner factors, defendants' policy (as opposed to the Wake County Superior Court's order), did not ban all communication between plaintiff and his wife. Plaintiff was allowed indirect communication through third parties, which he used extensively until the state trial court banned all communication on May 16, 2017.  (See Pl's Dep. (DE 141-13) at 33:22–34:21; Butler Aff. Ex. 6 (DE 141-3) at 49).[16]   Defendants also have established they would be substantially burdened if forced to accommodate plaintiff's request for spousal communication.   If plaintiff were allowed to communicate with his wife, then all co-defendants could similarly request such communication, posing a significant burden on detention officers to monitor such communications.   See Turner, 482 U.S. at 90 (permitting consideration of whether "an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff"); (see Butler Aff. (DE 141-3) ¶¶ 47–54).   Additionally, permitting communication among co-defendants presents institutional security risks that would further burden the officers.  (See Butler Aff. (DE 141-3) ¶¶ 47–54).   And plaintiff offers no ready alternatives to the wholesale ban on

---

[16]    Defendants, of course, are not responsible for any injury to the marital relationship that occurred as a result of the May 16, 2017, state court order.

direct communication.

For the reasons set forth above, the <u>Turner</u> factors all weigh in favor of defendants. On this record, the court finds that defendants' policy banning communication between plaintiff and his wife, where they are both incarcerated and potential co-defendants, is reasonably related to legitimate penological interests. See <u>Turner</u>, 482 U.S. at 89.[17]

Turning to the clearly established prong, plaintiff fails to offer cases establishing that plaintiff's right to spousal communication overcomes the legitimate institutional security interests implicated when the married couple are detained on similar charges and seek permission to communicate. Nor is such a right necessarily included within the fundamental right to marriage. See <u>Turner</u>, 482 U.S. at 95 (explaining the right to marry is "subject to substantial restrictions as a result of incarceration"). Accordingly, defendants are entitled to qualified immunity as to this claim.

Based on the foregoing, defendants' motion for summary judgment is granted as to plaintiff's Fourteenth Amendment claim challenging the ban on communication with his wife.

3.      Retaliation

The court next turns to plaintiff's retaliation claim, which alleges defendant Butler placed plaintiff in the PSC, a facility with less privileges and other undesirable conditions, in retaliation

---

[17]      To the extent plaintiff is challenging the policy on grounds that it prevented plaintiff from developing a joint defense with his wife, plaintiff's defense strategy should have been coordinated through his attorneys. Plaintiff is not entitled to hybrid pro se and counseled representation. See <u>McKaskle</u>, 465 U.S. at 183. And there is no claim or evidence suggesting plaintiff and his wife's attorneys (or their agents) were not allowed to meet with plaintiff and his wife collectively at the jail. For these reasons, plaintiff's reliance on <u>Perkins v. Wagner</u>, 513 F. Supp. 904 (E.D. Pa. 1981) and <u>Dooley v. Quick</u>, 598 F. Supp. 607 (D.R.I. 1984) is misplaced. <u>Dooley</u> involved pro se co-plaintiffs. 598 F. Supp. at 617–618. And <u>Perkins</u> does not address whether the co-defendants were permitted to engage in counseled visitation with co-defendants to develop trial strategy. See 513 F. Supp. at 906. The fact that plaintiff and his wife's attorneys elected not to pursue a joint defense strategy does not establish defendants prevented them from same.

for filing grievances. A retaliation claim requires proof of the following: 1) that the plaintiff engaged in constitutionally protected First Amendment activity; 2) the defendant took an action that adversely affected that activity; and 3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) ("Martin I"); see also Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine, 411 F.3d at 500 (internal quotations omitted).

The third element of a retaliation claim requires a showing that plaintiff's grievances were the "but for cause" of his transfer. Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) ("Martin II"). Where "an inmate shows that protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action . . . the burden of proving a permissible for basis for taking that action then shifts to the person who took it." Id. at 300 (adopting the burden-shifting framework in Mt. Healthy City School District Board of Education v. Doly, 429 U.S. 274 (1977) for prisoner retaliation claims). The defendant must show by a preponderance of the evidence that "it would have reached the same decision . . . in the absence of the protected conduct." Id. at 299.

Plaintiff has failed to establish a triable issue of fact on the causation element. The court will assume (without deciding) that plaintiff has produced sufficient evidence that his grievances were a substantial or motivating factor in the retaliation decision. Defendants offer the following evidence suggesting they would have reached the same decision in the absence of plaintiff's grievances. From the beginning of their arrival at the jail, WCSO officials had maintained

27

plaintiff and his wife in separate facilities. (Defs' Stmt. (DE 140) ¶ 18). At the time of plaintiff's transfer, he and his wife were subject to a no contact order. (Butler Aff. Ex. 6 (DE 141-3) at 49). On January 30, 2018, eight days before plaintiff's transfer, defendants transferred all female detainees to the WCDC. (Butler Aff. (DE 110-1) ¶52). In order to implement the no contact order and otherwise reduce the chances that plaintiff and his wife could communicate, defendants transferred plaintiff to the PSC on February 8, 2018. (Id. ¶¶ 52–54). In addition to the foregoing, plaintiff had filed multiple unsubstantiated complaints about a detention officer at the WCDC between December 30, 2017, and February 5, 2018, and defendants moved him to the PSC in order to avoid further conflict with that officer. (Id. ¶¶ 41–49).

The court finds this evidence is sufficient to meet defendants' burden of showing that plaintiff would have been transferred even if he did not file grievances. Defendants transferred all the female detainees to the WCDC (not just plaintiff's wife), therefore necessitating plaintiff's transfer in order to comply with the no contact order. (Id. ¶¶ 52–54). The fact that this policy was applied collectively to all the female inmates significantly undercuts plaintiff's claim of retaliatory animus. Plaintiff's conflict with the detention officer also raises security and other concerns that defendants ameliorated by transferring plaintiff to the PSC. (Id. ¶¶ 41–49).

Plaintiff does not dispute that the female detainees were transferred to the WCDC seven days before his transfer, or that he had a conflict with the officer. (See Defs' Stmt. (DE 109) ¶¶ 31–32; Pl's Opp. Stmt. (DE 120) ¶¶ 31–32).[18] Plaintiff suggests that the fact that he was temporarily rehoused to the WCDC for psychological observation after his transfer and was

---

[18] Plaintiff disputes that his complaints were unfounded, but there is no evidence suggesting he did not have an ongoing conflict with the officer. (See Pl's Opp. Stmt. (DE 120) ¶ 31).

28

permanently rehoused there in September 2018 establishes that defendants' proffered justifications are pretextual. (See Pl's Aff. (DE 122-1) ¶¶ 11–15). The temporary transfers for psychological observation do not undercut defendants' showing where those transfers were ordered by medical staff. (See Pl's App. Exs 7-14 (DE 122)). Plaintiff's permanent rehousing to the WCDC seven months later, while the detention officer and plaintiff's wife remained at the WCDC, does suggest defendants determined at that time that plaintiff could be housed at the WCDC despite the foregoing concerns. But in the absence of contemporaneous evidence of retaliation at the time of the transfer and in light of the overwhelming evidence of a non-retaliatory basis for the transfer, this fact standing alone is insufficient to rebut defendants' showing that the February 8 transfer would have occurred regardless of the grievances. See Martin II, 977 F.3d at 305 (focusing on plaintiff's evidence of contemporaneous retaliatory animus); Hughes v. Bedsole, 48 F.3d 1376, 1388 (4th Cir. 1995) ("Considering [the defendants'] legitimate, nondiscriminatory reasons and the absence of any evidence of animus by Bedsole on account of Hughes' free speech, . . . the basic facts of the temporal connection and [that another officer was not punished] do not create a jury issue.").

In sum, plaintiff has failed to establish a triable issue of fact with respect to the causation element of his retaliation claim.[19] Accordingly, defendants' motion for summary judgment is granted as to this claim, and plaintiff's cross motion is denied.

    4.    Section 1985

Plaintiff also attempts to assert a claim under 42 U.S.C. § 1985. Section 1985 states, in pertinent part, "[i]f two or more persons . . . conspire . . . for the purpose of depriving . . . any

---

[19]     In light of the foregoing, the court does not reach the clearly established prong of the qualified immunity analysis.

person or class of persons of the equal protection of the laws[,] . . . the party so injured or deprived

may have an action for the recovery of damages occasioned by such injury or deprivation, against

any one or more of the conspirators."   42 U.S.C. § 1985(3).

> To bring a claim under 42 U.S.C. § 1985, a plaintiff must show: (1) a conspiracy
> of two or more persons, (2) who are motivated by a specific class-based, invidiously
> discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights
> secured by the law to all, (4) and which results in injury to the plaintiff as (5) a
> consequence of an overt act committed by the defendants in connection with the
> conspiracy.

Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 637 (4th Cir. 2016) (quotation omitted).

"[T]he plaintiff must show an agreement or a meeting of the minds by the defendants to violate

the plaintiff's constitutional rights."   A Soc'y Without A Name v. Virginia, 655 F.3d 342, 346

(4th Cir. 2011) (quotation omitted).   Plaintiff's § 1985 claim is without merit where he fails to

provide admissible evidence of the foregoing elements.   See id.

        5.        Official Capacity Claims

Plaintiff's official capacity claims "generally represent only another way of pleading an

action against an entity of which an officer is an agent."   Kentucky v. Graham, 473 U.S. 159,

165–66 (1985).   Under the doctrine of Monell liability, a local governmental entity "is subject to

Section 1983 liability only when its 'policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the plaintiff's injury.'"

Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469–70 (4th Cir. 2013) (quoting Monell

v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).   A governmental entity

may be held liable pursuant to § 1983 in the following four scenarios:

> (1) through an express policy, such as a written ordinance or regulation; (2) through
> the decisions of a person with final policymaking authority; (3) through an
> omission, such as a failure to properly train officers, that "manifests deliberate

indifference to the rights of citizens"; or (4) through a practice that is so "persistent
and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218

(4th Cir. 1999)).

Here, where plaintiff fails to establish a triable issue of fact with respect to his underlying

constitutional claims against defendants in their individual capacities, the official capacity claims

likewise fail.   See id.   Accordingly, the motion for summary judgment is granted as to the official

capacity claims.

## CONCLUSION

Based on the foregoing, defendants' motions for summary judgment (DE 107, 138) are

GRANTED, and plaintiff's cross motion for partial summary judgment (DE 101) is DENIED.

The clerk is DIRECTED to close this case.

SO ORDERED, this the 28th day of September, 2021.

LOUISE W. FLANAGAN
United States District Judge

31