IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CT-3127-FL

| | | |
|---|---|---|
| NATHANIEL R. WEBB, | ) | |
| Plaintiff, | ) | |
| v. | ) | ORDER |
| DIRECTOR BUTLER, | ) | |
| Defendant.[1] | ) | |

This matter is before the court on defendant's renewed motion for summary judgment (DE 166), following remand from the United States Court of Appeals for the Fourth Circuit affirming in part, vacating in part, and remanding this court's September 28, 2021, judgment dismissing all claims. The motion was briefed fully and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff, a former state pretrial detainee proceeding pro se, commenced this action by filing complaint on May 31, 2018, asserting claims for violations of his civil rights pursuant to 42 U.S.C. §§ 1983 and 1985, premised on allegations that various correctional and law enforcement officials violated plaintiff's rights while he was a pretrial detainee at the Wake County Detention Center and the Wake County Public Safety Center.

---

[1] The court constructively amends the caption of this order to reflect that the only remaining defendant is director Butler. The court previously granted summary judgment with respect to plaintiff's claims against defendants Yolanda Banks, V. Frederick, Kenneth Blackwell, and Mark Szajnber, and that ruling was affirmed on direct appeal. See Webb v. Butler, No. 21-7441, 2023 WL 2597604 (4th Cir. Mar. 22, 2023). And the court dismissed plaintiff's claims against the Wake County Jail on December 21, 2018.

As pertinent here, this court granted motions for summary judgment by defendant and former defendants as to all claims on September 28, 2021. In its opinion entered March 22, 2023, the Fourth Circuit affirmed the grant of summary judgment as to plaintiff's claims regarding interference with his mail and the prohibitions on communicating with his wife. The Fourth Circuit, however, reversed the grant of summary judgment as to plaintiff's claim that defendant director Butler ("Butler"), the former director of detention services for the Wake County Sheriff's Office ("WCSO"), retaliated against him for filing grievances. Regarding this claim, the Fourth Circuit held that genuine issues of material fact precluded summary judgment on the causation element, and it remanded for further proceedings, including "whether a dispute of material fact remains regarding the other elements required for a retaliation claim." See Webb v. Butler, No. 21-7441, 2023 WL 2597604, at *1 (4th Cir. Mar. 22, 2023). The court of appeals also directed the court to consider whether defendant Butler is entitled to qualified immunity, and whether plaintiff identified a policy or custom leading to municipal liability. Id.

On remand, the court ordered defendant Butler to file renewed motion for summary judgment addressing the issues raised in the Fourth Circuit's opinion.[2] Defendant Butler timely filed the renewed motion, arguing that plaintiff cannot establish triable issue of fact on the second element of the retaliation claim, and that, in any event, he is entitled to qualified immunity. As to the official capacity claim, defendant Butler argues plaintiff fails to marshal any evidence establishing a claim for municipal liability.

In support, defendant Butler relies upon a memorandum of law, statement of material facts, and excerpts of transcript of plaintiff's deposition. In addition, defendant Butler incorporates by

---

[2] Although the court offered to reopen discovery, the parties concluded further discovery was unnecessary. (See DE 161, 162, 163).

reference previously filed summary judgment materials addressing the retaliation claim, which include memorandum of law, statement of material facts, and appendices of exhibits comprising the following:

1) affidavit of defendant Butler with exhibits 1-13 comprising WCSO detention policies, plaintiff's administrative grievances regarding contact with his wife, plaintiff's inmate requests, inmate logs, judicial records from plaintiff's criminal proceedings, Prison Rape Elimination Act investigative materials, and other miscellaneous records regarding plaintiff's pretrial detention;

2) additional administrative grievances filed by plaintiff;

3) affidavit of Jared S. Ollison, WCSO director of detention services with exhibits 1-5 comprising WCSO detention center resident handbook, and portions of the same exhibits filed in support of defendant Butler's affidavit;

4) warrant for plaintiff's arrest;

5) excerpts of plaintiff's inmate log; and

6) plaintiff's transcript of plea.

Plaintiff responded in opposition to the renewed motion, relying upon memorandum of law. In addition, plaintiff incorporates by reference previously filed summary judgment materials addressing the retaliation claim. These materials include plaintiff's original motion for partial summary judgment and response to defendant Butler's initial cross motion for summary judgment on the retaliation claim. The motion for partial summary judgment places reliance on memorandum of law, statement of material facts, plaintiff's personal declaration, and appendix of exhibits comprising the following:

3

1) plaintiff's administrative grievances and inmate requests;

2) statement of detention officer Lieutenant McDougald;

3) correspondence between plaintiff and Wake County Sheriff Donnie Harrison ("Sheriff Harrison");

4) correspondence between Virginia Tharrington ("Tharrington"), legal counsel to the WCSO, and plaintiff.

As for plaintiff's prior response in opposition to defendant Butler's cross motion for summary judgment, plaintiff relies upon memorandum of law, responsive statement of material facts, and appendix of exhibits comprising the following:

1) affidavit of plaintiff;

2) defendant Butler's responses to plaintiff's first request for admissions;

3) excerpts of the WCSO detention resident handbook;

4) plaintiff's medical and mental health records; and

5) plaintiff's administrative grievances.

Defendant Butler replied in support of the renewed motion for summary judgment.

## STATEMENT OF FACTS

Except as otherwise noted below, the court recounts the facts in the light most favorable to plaintiff. Following his arrest on felony charges and extradition to North Carolina, plaintiff was housed initially at the Wake County Detention Center ("WCDC") as a pretrial detainee. (Butler Aff. (DE 110-1) ¶¶ 18–19). At the time, plaintiff's wife also was a pretrial detainee housed at the PSC. (See id. ¶ 20). Throughout his pretrial detention, plaintiff submitted numerous grievances complaining about his conditions of confinement, including that detention officers violated his

4

rights by copying his mail and sending it to the prosecution team, and by prohibiting contact between plaintiff and his wife. (Pl.'s App. Ex. 1 (DE 122-1) ¶¶ 43, 46; see also Grievance Records (DE 110-2)).

WCSO detention policy allows detainees to appeal grievance responses to defendant Butler, the director of detention services. (WCSO Resident Handbook (DE 122-5)). Plaintiff repeatedly requested that defendant Butler respond to his grievances but he was not generally successful at obtaining direct responses from Butler. (See Pl's App. Ex. 1 (DE 122-1) ¶¶ 43–44; Grievance Records (DE 110-2) at 12, 13, 18, 20).[3] According to defendant Butler, he designated an authorized representative to respond to grievance appeals. (Defs' Stmt. (DE 109) ¶ 3)

Having received no responses from defendant Butler directly, plaintiff wrote to Sheriff Harrison on January 16, 2018, asserting the same complaints regarding interference with his mail and the prohibition on communication with his wife. (Pl's Stmt. (DE 101-1) ¶ 4; see also Sheriff Harrison Corr. (DE 101-2) at 11-13)). The correspondence to Sheriff Harrison was referred to Tharrington, the WCSO legal advisor, who responded approximately two weeks later. (Tharrington Corr. (DE 110-1) at 69–71). In the meantime, plaintiff filed one of his many grievances about the ban on communicating with his wife on January 29, 2018. (Butler Aff. Ex. 11 (DE 110-1) at 67). On February 5, 2018, defendant Butler responded to plaintiff's appeal of this grievance. (Butler Aff. (DE 110-1) ¶¶ 30–32). Defendant Butler explained that plaintiff was not allowed to communicate with his wife due to entry of a no contact order in plaintiff's criminal

---

[3] Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

case. (Id. ¶ 32; Grievance Resp. (DE 110-1) at 65).

Plaintiff also filed several grievances during the same timeframe regarding his interactions with officer Dalrymple ("Dalrymple"). The first grievance was filed pursuant to the Prison Rape Elimination Act ("PREA") based on Dalrymple allegedly touching plaintiff in a sexual manner during a search. (Pl.'s App. Ex. 1 (DE 122-1) ¶ 25). On or about January 30, 2018, plaintiff filed second PREA grievance against Dalrymple, alleging he woke him up in the middle of the night and requested that plaintiff show him his genitals. (Id. ¶ 26). On February 8, 2018, plaintiff filed third grievance against Dalrymple, asserting that he refused to let him use the restroom and made several disrespectful comments during a verbal altercation. (Id. ¶ 27).

Plaintiff was transferred to the Wake County Public Safety Center ("PSC"), a different pretrial detention facility, on February 8, 2018, the same day he filed the latest grievance against Dalrymple and three days after defendant Butler responded to plaintiff's grievance regarding marital communications. (See id. ¶ 10; Butler Aff. (DE 101-1) ¶ 35). Following the transfer, plaintiff remained housed in a general population dorm, and he retained the same "medium" custody classification. (Ollison Aff. (DE 110-3) ¶¶ 18–19; Butler Aff. (DE 110-1) ¶¶ 9, 57–58). As a result, plaintiff was afforded the same general privileges at the PSC that he enjoyed at the WCDC, including for mail, visitation, use of the unit dayroom when the facility is not in lockdown, commissary, use of the law library, recreation, phone privileges, and watching television. (Ollison Aff. (DE 110-3) ¶ 19; Butler Aff. (DE 110-1) ¶¶ 9, 57–58).

Nonetheless, plaintiff asserts that he was transferred to the PSC as retaliation for pursuing the foregoing grievances where the PSC imposes more restrictive and dangerous conditions of confinement relative to the WCDC. According to plaintiff, the PSC is older than the WCDC, and

6

it is referred to as "the dungeon" by other detainees due to the lack of natural light. (See Pl's App. Ex. 1 (DE 122-1) ¶ 16). The PSC houses general population inmates, disciplinary segregation units, juvenile housing units, and federal detainees. (Id.). The cell blocks are smaller, darker, and "generally psychologically oppressive." (Id.).

Due to the segregation and juvenile housing units, the PSC has more unscheduled facility-wide "lockdowns," (which require plaintiff to remain in his cell) than the WCDC. (Id. ¶ 17). Friday evening lockdowns also occur earlier in the evening at the PSC, at approximately 5:30 p.m., to accommodate processing of inmates into the weekend service program. (Id.; see also Defs' Stmt. (DE 109) ¶ 28). However, other than the additional unscheduled lockdowns and the earlier Friday lockdowns, plaintiff acknowledges that his out-of-cell time typically was the same at the two facilities. (Def. Butler App. Ex. N. (DE 169-1) at 67:5–13).

Unlike the WCDC, the PSC recreation areas do not have natural light and air, and the recreation areas generally can be accessed more readily at the WCDC than the PSC. (Pl's App. Ex. 1 (DE 122-1) ¶ 18). Plaintiff could access the WCDC recreation area daily, but at the PSC recreation is only available Monday through Friday. (See id.; Pl's App. Ex. 16 (DE 122-16)).

The PSC also does not have electronic kiosks permitting emails with family or friends, or easy access to the grievance procedure. (Id. ¶ 19). Thus, plaintiff could not send or receive emails during his time at the PSC, whereas that privilege was available at the WCDC. (Id.). The absence of kiosks also makes filing grievances more onerous at the PSC, especially since the paper forms are often unavailable.[4] (Id.). Plaintiff's housing unit at the WCDC had two television sets and

---

[4] Notably, plaintiff filed at least four grievances during his time at the PSC notwithstanding any lack of forms. (Def's App. Ex. B (DE 110-2) at 31, 33, 36, 48).

four phones for detainees, but the PSC only provides one television and two phones for plaintiff's unit.[5] (Id. ¶¶ 21–22). Due to the greater amount of lockdown time and fewer phones, plaintiff was not able to use the telephone as much at the PSC. (Id. ¶ 22). Finally, the PSC is a more "hostile" environment where correctional officers are not consistently present in the dorm, which "leads to the units being self-governed" by other inmates referred to as "pod bosses." (Id. ¶ 23).

Several weeks after plaintiff's transfer to the PSC, mental health staff placed him on psychological observation due to suicidal ideations, and a psychiatrist prescribed mental health medications. (Pl's App. Exs 7-14 (DE 122)). The psychiatrist determined that plaintiff was "adversely affected by [the PSC's] darkened environment" and recommended transfer to the WCDC. (Pl's App. Ex. 13 (DE 122-13)). Plaintiff, however, remained housed on the PSC until September 2018, except for transfers to the WCDC for psychological observations. (Pl.'s App. Ex. 1 (DE 122-1) ¶¶ 10–15).

According to defendant Butler, plaintiff was transferred to the PSC because his wife had been transferred to the WCDC and due to plaintiff's conflicts with Dalrymple at the WCDC. (Butler Aff. (DE 110-1) ¶¶ 48, 51–56). Plaintiff notes, however, that he was rehoused to the WCDC on multiple occasions for psychological observation, and that he was transferred back to the WCDC on September 19, 2018, where he remained until his transfer to state custody in December 2018, even though plaintiff's wife and Dalrymple were both assigned to the WCDC during these periods of time. (Pl's App. Ex. 1 (DE 122-1) ¶¶ 10–15; Butler Aff. Ex. 3 (DE 110-1) at 18).

---

[5] The PSC unit had fewer televisions and phones because it houses half the number of detainees relative to plaintiff's WCDC unit. (Ollison Aff. (DE 110-3) ¶ 20).

8

**DISCUSSION**

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).[6]

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the

---

[6]      Internal citations and quotation marks are omitted from all citations unless otherwise specified.

party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B. Analysis

The Fourth Circuit's opinion remanding this case instructed this court to address the following issues regarding plaintiff's retaliation claim:

> whether a dispute of material fact remains regarding the other elements required for a retaliation claim, whether Butler was entitled to qualified immunity, and whether Webb identified a policy or custom leading to municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).

Webb, 2023 WL 2597604, at *2. The court addresses each issue below.

1. Retaliation claim – second element

A retaliation claim requires proof of the following: 1) that the plaintiff engaged in constitutionally protected First Amendment activity; 2) the defendant took an action that adversely affected that activity; and 3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017); see also Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

10

Here, defendant Butler concedes plaintiff engaged in First Amendment activity by filing administrative grievances (the first element), and the Fourth Circuit has determined that genuine issues of material fact preclude entry of summary judgment on the causation element (the third element). See Martin, 858 F.3d at 249 (recognizing that inmates engage in protected First Amendment activity when they file administrative grievances); Webb, 2023 WL 2597604, at *2; (Def's Mem. (DE 167) at 3). Accordingly, only the second element is at issue.

"[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin, 858 F.3d at 249; Constantine, 411 F.3d at 500. This is an objective standard, and thus the plaintiff's individual reaction to the defendant's conduct is not dispositive of the second element. See Constantine, 411 F.3d at 500 ("We reject the defendants' suggestion that this inquiry depends upon the actual effect of the retaliatory conduct on a particular plaintiff."). Nonetheless, the plaintiff's "actual response to the retaliatory conduct [can] provide[] some evidence of the tendency of that conduct to chill First Amendment activity." See Jones v. Solomon, 90 F.4th 198, 214 (4th Cir. 2024); Constantine, 411 F.3d at 500. Finally, "a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than de minimis inconvenience to her exercise of First Amendment rights." Constantine, 411 F.3d at 500.

Here, plaintiff has established a genuine dispute of fact on the adverse action element. By his transfer to the PSC, plaintiff lost email privileges, endured longer and more frequent lockdown time, his access to recreation time was more limited, and he experienced a more hostile environment with less officer supervision. (Pl's App. Ex. (DE 221-1) ¶¶ 16–23). Moreover, while not a dispositive issue, the fact that plaintiff sought and received psychiatric treatment based on

11

lack of access to natural light provides "some evidence" relevant to the second element. See Jones, 90 F.4th at 214; (see Pl's App. Exs. 7-14 (DE 122)). Indeed, plaintiff's symptoms were so significant that a psychiatrist recommended that he be returned to the WCDC due to the lack of access to natural light and its effect on his health. (Pl's App. Ex. 13 (DE 122-13)). Considering this evidence together, a reasonable jury could find that these conditions would deter a person of ordinary firmness from filing administrative grievances. See Jones, 90 F.4th at 215; Martin, 858 F.3d at 249.

Defendants argue that the foregoing differences between the WCDC and the PSC were de minimis, and thus plaintiff has not established a triable issue of fact on the second element. See Constantine, 411 F.3d at 500 (concluding de minimis inconveniences would not deter a person of ordinary firmness from the exercise of First Amendment rights). While several of plaintiff's complaints clearly are de minimis,[7] the court cannot say that the loss of email privileges, a more hostile environment with less supervision, more lockdown time, and less access to natural light or recreation, especially when considered together with plaintiff's reaction, constitute de minimis inconveniences to a pretrial detainee.

Moreover, the Fourth Circuit recently concluded that transfer to a more dangerous correctional facility, coupled with loss of enrollment in a computer class, created a triable issue of fact on the second element:

> Additionally, a transfer or placement in a more restrictive or dangerous setting can constitute an adverse action.
> . . .
> Viewed in the light most favorable to Jones, the facts in this case support the conclusion that the transfer was an adverse action. The evidence indicates that Lanesboro was, at minimum, perceived by inmates to be more dangerous than

---

[7] Plaintiff, for example, argues that he received haircuts on a weekly basis at the WCDC but on a biweekly basis at the PSC. (Pl's Mem. (DE 121) at 4).

12

> Avery-Mitchell. And Lanesboro posed a particular danger for Jones: another prisoner who had previously assaulted him was housed there. Beyond the potential consequences for his physical safety, Jones also experienced another consequence from the transfer—it automatically disenrolled him from a computer-applications class he was taking at Avery-Mitchell. Moreover, we can infer from the prison officials' statements that Jones's transfer was intended to be punitive, which suggests that something about that transfer—whether having to leave Avery-Mitchell, having to go to Lanesboro, or both—was intended to negatively impact Jones.

Jones, 90 F.4th at 214–15. If the differences in Jones are sufficient to survive summary judgment on the second element, the evidence in this case, which indicates an even more restrictive and oppressive environment, similarly clears that hurdle. (See Pl's App. Ex. 1 ¶¶ 16–23 & Exs. 7-14 (DE 122)).

Defendants emphasize that plaintiff retained the same custody status and general privileges at the PSC. But there is no indication that the transfer in Jones resulted in a change of custody classification. See 90 F.4th at 214–15. Jones therefore indicates that a change in custody classification is not required in order to establish the adverse action element of a retaliation claim. See id.

Accordingly, the record when viewed in the light most favorable to plaintiff establishes genuine disputes of material fact on the second element of the retaliation claim. Defendants are not entitled to summary judgment on this basis.

    2.    Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Iko v. Shreve, 535 F.3d 225, 237 (4th Cir. 2008). The qualified immunity analysis proceeds in two steps, which the court

"may address in whichever sequence will best facilitate the fair and efficient disposition of the case." Pfaller v. Amonette, 55 F.4th 436, 444 (4th Cir. 2022). First, the plaintiff must show a violation of a constitutional right. Id.; Stanton v. Elliot, 25 F.4th 227, 233 (4th Cir. 2022). Second, defendants bear the burden of showing the right at issue was not "clearly established" at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 231 (2009); Stanton, 25 F.4th at 233.

As to the second prong, officials' actions violate clearly established rights only if their unlawfulness is apparent in light of preexisting law. Iko, 535 F.3d at 237–38. Under this standard, officials must show only the legal knowledge of an objectively reasonable official in similar circumstances. Id. at 238. Officials are liable for transgressing only "bright lines," not for "bad guesses in gray areas." Id. Finally, the Supreme Court has instructed that, for the purposes of the second prong, rights must be established with a high degree of specificity, so that "existing precedent must have placed the [legal] question beyond debate." Kisela v. Hughes, 138 S. Ct. 1148, 1152–53 (2018). In making this determination, the court ordinarily looks only at the law as established by the Supreme Court, the Fourth Circuit, or the Supreme Court of North Carolina. See Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th Cir. 2017); Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). However, the court may also consider a "consensus of cases of persuasive authority from other jurisdictions." Booker, 855 F.3d at 539.

Here, as explained above, plaintiff has established that "the facts viewed in [plaintiff's] favor make out a violation of his . . . constitutional rights" and he therefore carries his burden as to the first prong of the analysis. Stanton, 25 F.4th at 233. Turning to the second prong, the Fourth Circuit recently held that "it was clearly established [in 2015] that transferring a prisoner

14

to another institution in retaliation for the prisoner filing a grievance violated his First Amendment rights." Jones, 90 F.4th at 216. That is the same right at issue in this case. While defendants attempt to define the right at issue more specifically – plaintiff's "right to be free from a retaliatory transfer to another general population unit in the same prison [8] that has [in]consequential differences in living conditions" – this court, of course, is bound by the framing of the right as set forth in Jones. See Payne v. Taslimi, 998 F.3d 648, 654 (4th Cir. 2021); (Pl's Mem. (DE 167) at 9). Accordingly, defendants are not entitled to qualified immunity at this juncture.

In sum, the facts viewed in the light most favorable to plaintiff make out a violation of his First Amendment rights, and the right to be free from retaliation in this context was clearly established when plaintiff was transferred in 2018. The motion for summary judgment therefore must be denied as to plaintiff's retaliation claim asserted against defendant Butler in his individual capacity.

3. Monell Liability

Finally, the court addresses plaintiff's claim for Monell liability premised on assertions that defendant Butler and other officials regularly transferred detainees to the PSC as retaliation for filing grievances. Because plaintiff asserts this claim against defendant Butler in his official capacity, it is in effect a claim against the entity employing him. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985). And in order to establish a constitutional claim against Wake County or the Wake County Sheriff's Office,[9] plaintiff must show that the county's "policy or custom,

---

[8] The court notes the PSC and the WCDC are not located in the same geographical location, although they are approximately four miles away from each other. (Butler Aff. (DE 110-1) ¶ 2).

[9] The parties do not address whether Wake County, the sheriff's office, or some other defendant, is the appropriate entity for purposes of analyzing plaintiff's official capacity claim. See Parker v. Bladen, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008) (discussing legal distinctions between county and sheriff's office under North Carolina law). Herein, the court uses the shorthand Wake County or "the county" to refer to the entity defendant encompassed

15

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the plaintiff's injury." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978); Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469–70 (4th Cir. 2013). A local government entity may be held liable pursuant to § 1983 in the following four scenarios:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

Plaintiff fails to offer sufficient evidence to withstand summary judgment with respect to any Monell claim. First, plaintiff's conclusory assertions that defendant Butler or other jail officials regularly threaten detainees with transfer to the PSC does establish an express policy or persistent and widespread practice of retaliating against detainees for filing grievances. (See Pl's App. Ex. 1 (DE 122-1) ¶ 16 (asserting that jail officials "often threaten detainees at the WCDC with 'going downtown to the PSC' knowing that the PSC is more restrictive"); Pl's Mem. (DE 121) at 12 (plaintiff arguing that he established Monell claim on the basis of "widespread practice" of threatening detainees as alleged in paragraph 16 of his affidavit). The fact that unidentified officers threatened to transfer detainees to the PSC does not establish that any detainees actually were transferred as retaliation for filing grievances. Accordingly, to the extent plaintiff is relying on a widespread or persistent practice, he has failed to marshal sufficient evidence to survive

---

by plaintiff's official capacity claim.

summary judgment. See Lytle, 326 F.3d at 473–74; Carter, 164 F.3d at 220; see also Wai Man Tom v. Hospitality Ventures, 980 F.3d 1027, 1037 (4th Cir. 2020) (explaining "conclusory allegations . . ., without more, are insufficient to preclude granting the summary judgment motion").

Second, to the extent plaintiff is relying on the assertion that defendant Butler transferred him to the PSC, and that this decision is attributable to the county because defendant Butler had final policymaking authority, that claim also is without merit. For this claim, plaintiff must establish that defendant Butler had "final authority to establish municipal policy with respect to the action ordered." See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); see also Hunter v. Town of Mocksville, N.C., 897 F.3d 538, 554 (4th Cir. 2018) ("[W]e have recognized that a governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances so long as that governmental unit possessed final authority to create official policy."). And "the question of who possess final policymaking authority is one of state law." Hunter, 897 F.3d at 555.

Here, plaintiff fails to offer evidence or argument that defendant Butler had final policymaking authority for purposes of transferring plaintiff to the PSC. See Pembaur, 475 U.S. at 481. The fact that defendant Butler was the "facility director" for the Wake County pretrial detention facilities does not standing alone establish that he had final policymaking authority. (See Compl. (DE 1-1) ¶ 18). To the contrary, the evidence suggests Sheriff Harrison had final policymaking authority. (See Pl's App. (DE 101-2) at 14 (correspondence from Wake County Sheriff's Office addressing plaintiff's complaints about correspondence with his wife and other issues). Moreover, North Carolina law provides that the sheriff, not any facility director, generally

17

possesses final policymaking authority over issues at the jail. See N.C. Gen. Stat. 162-22 (providing the "sheriff shall have the care and custody of the jail in his county, and shall be, or appoint, the keeper thereof."). In sum, plaintiff has failed to meet his burden of establishing that defendant Butler had final policymaking authority, as required to establish Monell liability under the second method. See Hunter, 897 F.3d at 554. Accordingly, defendant's motion for summary judgment is granted as to the Monell claim.

## CONCLUSION

Based on the foregoing, defendant's renewed motion for summary judgment (DE 166) is GRANTED in part and DENIED in part. The motion is granted as to plaintiff's official capacity claim, and that claim is DISMISSED. The motion is denied as to the retaliation claim asserted against defendant Butler in his individual capacity. Before entering a trial scheduling order, the court requires that the parties participate in a settlement conference. Accordingly, pursuant to Local Alternative Dispute Rule 101.1, EDNC, this case is REFERRED to United States Magistrate Judge Robert T. Numbers, II, for a court-hosted settlement conference, for the purpose of resolving all remaining issues in dispute. The magistrate judge will notify the parties how he wishes to proceed. In the event the parties do not reach a resolution of this action, further order regarding trial planning and scheduling will follow.

SO ORDERED, this the 27th day of March, 2024.

_____
LOUISE W. FLANAGAN
United States District Judge

18

Case 5:18-ct-03127-FL   Document 173   Filed 03/27/24   Page 18 of 18